Luis Coll Watlington, peticionario y apelante, v. Diego Biascoechea, demandado y apelado.

Núm. 7641.—*Sometido:* Diciembre 17, 1937. *Resuelto:* Febrero 24, 1938.

754

*Francisco M. Susoni, Jr.,* abogado del apelante; *Dubón & Ochoteco,* abogados del apelado.

El Juez Asociado Señor Wolf emitió la opinión del tribunal.

El Dr. Luis Coll Watlington es un dentista con oficina abierta en el núm. 261 de la Avenida Ponce de León, en Santurce. Directamente al lado contrario de la avenida está situada una policlínica perteneciente al Dr. Diego Biascoechea, que incluye entre sus varios departamentos uno de cirugía dental. Ambas oficinas han establecido un sistema por medio del cual ofrecen sus servicios profesionales a las clases más pobres a un cargo muy bajo por tratamiento específico. En su consecuencia su clientela pertenece más o menos a personas de pocos recursos y es natural que haya existido cierta rivalidad profesional entre ellos.

En junio 8, 1937, el Dr. Coll Watlington radicó una petición de *injunction,* en la que solicitaba se ordenara al Dr. Biascoechea que se abstuviera de destacar o estacionar ciertos hombres frente a la oficina del peticionario. Alegó que estos hombres, de conformidad con las instrucciones recibidas del demandado, constantemente trataban de sonsacar la clientela del peticionario diciendo a los pacientes en perspectiva que podían ser atendidos sin dolor en la policlínica del demandado, cosa que no podían evitar en la oficina del peticionario por razón de su equipo e instrumental de inferior calidad. Alegó además que estos hombres les decían a todos sus clientes que debían ir a la policlínica del demandado. Se alegó en resumen que estos actos intervenían con el libre goce de la propiedad y profesión del peticionario y que los mismos constituían un estorbo, cuya continuación podía y debía ser prohibida por la corte. Se alegó incidentalmente que estas molestias habían prevalecido durante los dos años anteriores a la fecha en que se radicó la petición.

En 18 de junio de 1937, la corte inferior en respuesta a la correspondiente moción y descansando en las declaraciones juradas que a ella se unieron, y previa prestación de una fianza por la suma de $500, expidió un entredicho (*restraining order*) contra el Dr. Biascoechea y una orden para mostrar causa por la cual la corte no debía expedir un *injunction* preliminar. El demandado radicó una contestación dirigida tanto a la petición como a la orden para mostrar causa, y en ella suscitaba varias objeciones de derecho y varias defensas de hecho. Las partes sometieron todo el caso por la prueba aducida durante las vistas que sobre la orden para mostrar causa fueron celebradas en junio 28 y julio 12, 1937.

Al declarar sin lugar la petición de *injunction*, la Corte de Distrito de San Juan dijo:

"Pasamos por alto las distintas cuestiones de derecho que levanta el demandado en su contestación y que discute en su alegato, ya que, a nuestro juicio, lo que se desprende de este estado de hechos, es una violación o quebrantamiento de normas de ética profesional."

El juez de distrito concluyó que "esto es para ser resuelto por los propios profesionales, y un tribunal de equidad no debe establecer normas de tal ética, ya que en Puerto Rico todas las profesiones tienen sus juntas u organismos encargados de velar por el cumplimiento de la profesión."

El peticionario apeló de la sentencia dictada por la corte inferior y señala cuatro errores, tres de los cuales se refieren a la teoría de la corte inferior, su análisis de la prueba y la conclusión que finalmente adoptó. El cuarto señalamiento ataca la corrección de la sentencia dictada.

Éste es un caso, que por la naturaleza delicada de su asunto, ha requerido mayor estudio y consideración que de ordinario. De continuo hemos tenido en mente los derechos de las partes y hemos tratado de prever las consecuencias de la sentencia que finalmente dictemos. Si las alegaciones de

hecho del peticionario son aceptadas como ciertas, su posición debe en verdad ser molesta e incómoda.

La corte inferior no entró a considerar las defensas legales presentadas por el apelado. Su discusión contribuirá a que la conclusión a que hemos llegado sea mejor entendida.

■■ Tres de esas defensas atacaron la suficiencia de las alegaciones, al dejar de aducir (*a*) que el peticionario hubiera sufrido daños irreparables, (*b*) que las manifestaciones de los agentes del demandado con respecto al peticionario eran falsas, y (*c*) que éste no tuviera un remedio legal adecuado.

A juzgar por las circunstancias especiales del caso, somos del criterio que los daños irreparables estuvieron necesariamente presentes. Es verdad que el peticionario en su alegato sostiene que el proceder del demandado no le ha privado de ningunos clientes, pero la presente causa de acción, según la hemos entendido, no depende por sí sola de la pérdida del negocio profesional, aunque ello tiene que desempeñar determinado papel en el caso, sino de la incomodidad y tensión a que el peticionario está sometido en su trabajo. Este estado de cosas causa ciertos daños y perjuicios, que no importan cuán pequeños sean, resultan irreparables. La demanda era por tanto suficiente a este respecto.

La segunda omisión carece de importancia. No estamos ante un pleito por libelo. Las supuestas manifestaciones de los agentes del demandado tenían prima facie por objeto perjudicar la reputación y buen nombre del Dr. Luis Coll Watlington y hacer que el ejercicio de la profesión por parte de éste se hiciera más difícil. La certeza o falsedad de las manifestaciones era cuestión de opinión, toda vez que ello envolvía la destreza con que el peticionario trataba a sus pacientes así como lo adecuado de su equipo.

La alegación contenida en el párrafo décimo de la demanda era suficiente para cubrir lo inadecuado del remedio ofrecido por la ley.

■ Las otras tres defensas legales presentadas a la petición fueron que el *injunction* no procedía ni por calumnia ni por libelo ni por quebrantamiento de los cánones de ética profesional, y que el peticionario había sido culpable de demora indebida (*laches*).

La defensa de *laches* no es una defensa buena. Si el demandado era responsable de los actos alegados, cada día que transcurría bajo el mismo estado de hechos creaba una nueva causa de acción, y el derecho a obtener un remedio tanto en ley o en equidad continuaba o era revivido.

■ En cuanto a la improcedencia del remedio de *injunction* para impedir o evitar·una calumnia, un libelo, o el quebrantamiento de la ética profesional, nos inclinamos a convenir con la corte inferior. Sin embargo, la verdadera cuestión envuelta en el caso que está ante nos es si la incomodidad, molestia o perturbación que acompañan a la comisión de actos que pueden dar origen a otra acción civil o criminal, son de por sí suficientes para justificar la intervención de una corte de equidad. Incidentalmente también la posible pérdida final de los clientes.

Como cuestión puramente de derecho, creemos que la mera existencia de una responsabilidad criminal o civil concurrente no debe privar a un peticionario de su remedio en equidad. (Véase e. g. 46 C. J. 762, sec. 370.) La dificultad estriba en poder distinguir los casos en que el acto como estorbo puede ser separado del acto como delito. Además, ha de considerarse la importancia y magnitud del acto y su efecto en la propiedad o vida del demandante.

Tenemos ante nos un caso difícil. Si las alegaciones del Dr. Coll Watlington son ciertas, el demandado puede estar sujeto a una acción por calumnia. La incomodidad y molestia que acompañan a los actos imputados, podrían entonces ser tomadas en consideración al determinar la cuantía de los daños. Empero, no podemos evitar creer que la forma en que la posible calumnia está siendo cometida no ocurre con fre-

cuencia. Es algo semejante el estacionamiento de piquetes para persuadir la clientela del demandante. La conducta del demandado sugiere una competencia desleal. El peticionario, no obstante, descansa exclusivamente en la existencia de una perturbación o estorbo (*nuisance*).

El artículo 277 del Código de Enjuiciamiento Civil (edición 1933), que define las perturbaciones o estorbos, lee así:

"Todo lo que fuere perjudicial a la salud, indecente u ofensivo a los sentidos, o que interrumpa el libre uso de la propiedad, de modo que impida el cómodo goce de la vida o de los bienes, constituye una perturbación que da lugar a una acción. Dicha acción podrá ser promovida por cualquiera persona cuyos bienes hubieren sido perjudicados o cuyo bienestar personal resulte menoscabado por dicha perturbación; y la sentencia podrá ordenar que cese aquélla así como decretar el resarcimiento de los perjuicios."

Difícilmente podría imaginarse un estatuto más amplio. Sus preceptos deben ser interpretados razonablemente. La situación con que nos confrontamos es insólita y no hemos podido hallar ninguna decisión que sea enteramente aplicable a los hechos de este caso, mas ello no ha de disuadirnos una vez que estemos convencidos de la justicia de las pretensiones del peticionario. El apelado ha citado varios casos que niegan la jurisdicción de una corte de equidad para impedir la publicación de un libelo. En general no diferimos de tal principio. Pero aquí hay algo más que la simple comisión de una calumnia o libelo. Se sostiene que los agentes del demandado forman guardia directamente frente a la entrada de la oficina del peticionario e interrogan o molestan a cuanto cliente llega a ella. El Dr. Coll Watlington constantemente recibe quejas de sus pacientes y, según se verá cuando discutamos la prueba, en más de una ocasión ha tenido que solicitar la ayuda de aquéllos que están encargados de mantener la paz pública. El peticionario tiene derecho a ejercer su profesión sin que se le moleste y libre de toda clase de perturbaciones. El proceder de los empleados del apelado, al quedar probado satisfactoriamente, ha molestado al peti-

cionario en el ejercicio de su profesión, y por ende en el disfrute de su vida. A nuestro juicio, el estatuto abarca el presente caso.

■ Analicemos ahora la prueba que estuvo ante la corte inferior para su consideración. El juez sentenciador la describió del siguiente modo:

" . . . La prueba no revela que ningún cliente haya sido inducido a error. Todo lo que revela la prueba es una competencia para sostener cada uno el mayor número de clientes, puesto que no podemos ignorar la prueba del demandado. No está tan desprovista de hechos la prueba del demandado que permita se establezca una preponderancia absoluta a favor del peticionario en cuanto a continuas actividades para quitarse la clientela."

El primer testigo del peticionario lo fué Rafael B. Díaz, Jefe de la Policía para el Distrito de San Juan. Declaró que había sido llamado con frecuencia por el Dr. L. Coll Watlington y su abogado, el Sr. Susoni, para recibir quejas respecto al estacionamiento de ciertos individuos frente a la oficina dental del primero en la parada 26, en Santurce; que fué allá en una ocasión y encontró que un peón estaba así destacado, le dijo que se retirara y el hombre entonces entró en la clínica del demandado; que también halló a un hombre llamado Verdejo frente a la policlínica del demandado y le dijo, al igual que al hombre ya mencionado, que no molestara más.

El siguiente testigo llamado a declarar lo fué Marcelino Romaní, a la sazón Fiscal de Distrito de San Juan. Su testimonio sacó a relucir el hecho de que el peticionario se había quejado de que ciertos hombres eran puestos frente a su oficina y desacreditaban a éste en el ejercicio de su profesión, y que el peticionario manifestó al testigo que el demandado había colocado esos hombres allí. Romaní continuó diciendo que llamó al Dr. Biascoechea y que éste negó todo, pero admitió que había tenido que tomar como empleado un hombre llamado Verdejo para que manifestara a los pacien-

tes dónde estaba realmente situada la policlínica del deman-
dado. El testigo finalmente manifestó que como resultado
de la investigación había acusado a Verdejo de calumniar la
persona y profesión del peticionario y exigídole una fianza
de $500, que fué prestada por los Drs. Rivera Aulet y Bias-
coechea.

El peticionario declaró personalmente que su oficina en
Santurce, está abierta de 8 a 10 de la mañana y de 1 a 3 de
la tarde; que durante esas horas siempre están destacados
dos hombres frente a la entrada a su oficina, uno al lado con-
trario de la calle y uno al lado suyo; que estos hombres de-
tienen o tratan de detener a todos y cada uno de sus clien-
tes y les hacen toda clase de historias respecto a la manera
en que el peticionario presta servicios, en detrimento suyo;
que él mismo desde su oficina ha oído estas observaciones en
innumerables ocasiones; que este estado de cosas hace que
el ejercicio de su profesión sea difícil e incómodo; que los
hombres se retiran tan pronto como el peticionario cierra su
oficina. En la repregunta se sacó a relucir que el peticiona-
rio había estado asociado con la policlínica del demandado y
había salido de allí el 13 de julio de 1935, que fué un sábado,
y que al siguiente lunes, julio 15, 1935, había establecido su
oficina en el sitio donde se encuentra hoy en día; que el pe-
ticionario había puesto grandes letreros que leían más o me-
nos en la misma forma que los del demandado, es decir
"DISPENSARIO DENTAL—TRABAJOS A PLAZOS", y "TRABAJOS A
PLAZO", pero que el demandado anunciaba extracciones de
dientes a 50 centavos, mientras que el peticionario no lo ha-
cía así; que a indicación del Coronel Orbeta de la Policía
Insular había agregado un letrero grande con el nombre del
peticionario y que el Dr. Biascoechea nunca antes había men-
cionado ni se había quejado de que no tuviera tal letrero;
que el peticionario siempre había tenido un letrero pequeño
con su nombre, a la vista de todos.

Angel Borrero, policía insular, declaró que a instancias
del Dr. Coll Watlington había ido a la oficina de éste a dis-

persar varios hombres que le molestaban; que arrestó a dos de ellos por violación de una ordenanza municipal que prohibe los grupos en las aceras; que el peticionario había llamado con frecuencia al cuartel para quejarse de que había ciertos hombres frente a su oficina.

Epifanio Jiménez, Antonio Figueroa y María Carrillo ocuparon la silla de los testigos para corroborar los hechos ya expuestos por el peticionario. Epifanio Jiménez describió cómo llevó a sus padres a la oficina del peticionario para que les extrajeran algunas piezas y cómo fueron detenidos y molestados por un hombre que se hallaba en la acera y que les dijo que fueran al otro lado de la calle donde estarían mejor asistidos; que cuando salieron el mismo hombre le dijo que el Dr. Biascoechea quería verlo; que cruzó la calle y esperó pero que el Dr. Biascoechea no salió. Antonio Figueroa y María Carrillo declararon que eran clientes del peticionario y que fueron detenidos por un hombre que estaba frente a su oficina y quien les dijo que cruzaran la calle en vez de ir allí, y que el peticionario era deficiente en el ejercicio de su profesión y les cobraría más que el Dr. Biascoechea.

Lo anterior es más o menos un resumen de la prueba oral presentada por el peticionario en apoyo de su contención de que se destacaban hombres frente a su oficina intencionalmente. En adición a ello, se ofreció y admitió como prueba una serie de siete fotografías tomadas por Jesús T. Piñero, que pueden tener algún peso para ayudar a determinar el verdadero estado de cosas.

Fueron tomadas del balcón del frente de la casa del peticionario. Las fotografías A y B muestran un hombre en mangas de camisa recostado contra un árbol en la acera más cerca de la oficina, aparentemente hablando a una joven; el *exhibit* C presenta al hombre y a la joven entrando a la clínica del demandado al otro lado de la calle; el *exhibit* D muestra una vez más al mismo hombre y a otro recostados

contra árboles que están frente a la oficina del peticionario; el *exhibit* E también muestra al mismo hombre recostado contra el árbol y una guagua que acaba de pasar; el *exhibit* F a otro hombre a través de la calle y el *exhibit* G a ambos hombres hablando entre sí. Se admitió que estas fotografías fueron tomadas el 11 de junio de 1937.

El otro testigo importante presentado por el peticionario lo fué Juan Moreno Torres. Su declaración es significativa porque fué el único que conectó directamente al demandado por lo menos con el hombre que se hallaba frente a la oficina del demandado, José Verdejo. Dijo que en una época era chófer del demandado y que había conducido a otro hombre llamado Luis Bayrón, en el automóvil del demandado para que consiguiera a Verdejo y que había oído al Dr. Biascoechea decir a Verdejo que se parara frente a la oficina del Dr. Coll y le dijera a sus pacientes que vinieran a la de él, a la clínica del demandado, y que si el Dr. Coll decía algo que le agrediera, que el demandado se ocuparía de pagarle la multa. La corte inferior descartó expresamente el testimonio de este testigo por no merecerle crédito.

El Dr. Biascoechea declaró ampliamente sobre toda la cuestión. Hizo una historia de sus relaciones con el Dr. Coll Watlington y con otro dentista, es decir con el Dr. Torruella. Admitió, tanto en la silla de los testigos como en su contestación, haber empleado a Verdejo y a otros, pero insistió en que lo hacía sólo con el fin de dirigir sus pacientes a la clínica correspondiente, toda vez que había recibido informes de varios de ellos al efecto de que por equivocación habían ido a la oficina del peticionario y allí se les había dicho que el departamento dental del demandado había sido trasladado. Las instrucciones que dijo haber dado a sus agentes prohibían estrictamente a éstos criticar o calumniar el nombre o práctica de cualquier colega profesional, y que sus sirvientes sólo recibieron instrucciones de servir de guías. Admitió saber que Verdejo había sido convicto de calumniar al Dr.

Coll Watlington y haber tenido que pagar una multa y que a pesar de ello lo retenía en su empleo alegando que tenía que impedir que sus pacientes fueran por equivocación a la oficina del peticionario. Manifestó que tanto el fiscal Romaní como el Coronel Orbeta le habían dicho que él no hacía nada en contravención de la ley.

La mayoría de los otros testigos del demandado declararon que un señor de apellido Alonso, que era el arrendador de la oficina del peticionario, se sentaba en el balcón del frente de la casa y les decía a los que le *preguntaban* que aquélla era la clínica dental del Dr. Biascoechea.

La lectura y apreciación de toda la prueba nos ha convencido de que su preponderancia era suficiente para demostrar que ciertos hombres están destacados casi constantemente durante las horas laborables frente al edificio donde la oficina del peticionario está situada, y que estos hombres le molestan al detener sus clientes y al persuadirles para que visiten la clínica del demandado. De esta conclusión, aun descartando el testimonio de Juan Moreno Torres, conforme lo hizo la corte inferior, tanto la prueba oral como circunstancial, así como la documental, nos inducen, actuando como corte de equidad, razonablemente a creer que los hombres fueron destacados allí por el Dr. Biascoechea e instruídos en alguna forma, de seguro oralmente, que restaran clientes al peticionario.

Por tanto, hemos llegado a la conclusión de que en bien de la justicia y de la preservación de la paz pública, al demandado debe impedírsele mediante *injunction* que destaque a cualquiera o a cualesquiera personas frente a la oficina del peticionario con el fin de persuadir a los clientes de éste que le abandonen o de intervenir en alguna forma que impida que el demandante ejerza su profesión tranquilamente y sin molestias de ninguna índole.

Los Jueces Asociados Señores Hutchison y Córdova Dávila no intervinieron.